No. 31,865

E. L. Laycock, *Appellant*, v. E. L. Study, *Appellee*.

(44 P. 2d 220)

Opinion filed May 4, 1935.

*W. L. Cunningham*, of Arkansas City, *J. N. Tincher, Clyde Raleigh, Leaford F. Cushenberry*, all of Hutchinson, and *Tom Irby*, of Ponca City, Okla., for the appellant.

*A. C. Malloy, Roy C. Davis, Warren H. White* and *Frank S. Hodge*, all of Hutchinson, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action for an accounting between plaintiff and defendant on account of a claimed partnership.

Omitting formal parts, the petition alleged that plaintiff and defendant entered into an oral agreement to become partners in the business of buying, selling and operating oil and gas leases; that each should devote his time to the business, and leases taken in the name of either should belong to the partnership; that all commissions earned by either should be divided, except commissions paid either for securing leases in territories designated by oil companies in advance of securing such leases, and that there was no agreement as to the duration of such partnership; that oil and gas leases were taken and sold and partial division of profits and losses made; that no other agreement was entered into relative to the partnership and there had been no dissolution of it and no final accounting; that defendant by a series of transactions, the exact nature of which was unknown to plaintiff, had secured a lease of certain lands (the Haury lease hereafter mentioned); that while the lease stood in defendant's name it was in truth partnership property, and defendant had been collecting approximately $1,000 per month therefrom; that defendant had received at least $———— over his due proportion of partnership profits and appropriated same to his own use. The prayer was for an accounting. Defendant's verified answer denied any partnership and that plaintiff was entitled to an accounting; that the transactions between plaintiff and defendant were limited solely to individual instances of purchase and sale, and that plaintiff had received his full compensation therefor. Laches and the bar of the statute of limitations were pleaded. Plaintiff's reply denied inconsistent allegations of the answer, alleged joint ownership of the property described in the petition; that plaintiff trusted and relied upon defendant as he handled other property of like kind and character and plaintiff had done nothing to waive or forego his interest in the partnership property.

The trial court made findings of fact and conclusions of law as follows:

"Plaintiff and defendant for some years prior to June, 1928, had each been engaged in procuring and selling or otherwise dealing in oil and gas leases and royalties in the state of Kansas. Each of the parties had acted in the capacity of representatives of oil companies or individuals interested in the oil busi-

ness in procuring oil and gas leases and royalties, and they had also been engaged in such business on their own accounts.

"In the spring of 1928 they began to operate jointly with each other, agreeing that they would take jointly and own and dispose of such leases in the Halstead field as they might agree upon, get an office and divide the expense. One or both of the parties then leased an office and bought some secondhand furniture, each contributing half of the cost. They also had a sign posted on their window reading: 'E. L. Study and E. L. Laycock, Oil and Gas Leases and Royalties.' Their arrangement did not contemplate either drilling or operating any wells.

"After leasing this office in July, 1928, each continued to purchase leases for companies they represented individually, bought some leases jointly, each contributing half of the cost, taking some of them in the name of E. L. Laycock, the wife of the plaintiff, and some in the name of E. L. Study. Leases were never taken in the name of the two jointly. They did not maintain a joint bank account and no joint books of account were kept; the only indication as to the ownership of the leases was contained in a wall map. Fifteen or twenty leases were handled in this manner and always after consultation between the parties, and where one or the other was not interested, the lease, if taken, would be handled separately.

"Generally settlement between the parties was made after each lease deal was completed, but where the deal was not completed at once they were carried on a list of leases prepared by one or the other and submitted to the other party.

"During October or November, 1928, a disagreement arose which resulted in a declaration that they would not have any more joint deals and thereafter they dealt individually, and no further leases were obtained or handled jointly, although the parties continued to office in the same room.

"In August, 1928, one Daniel Haury executed an oil and gas lease covering all his undivided one-half interest in the west half of section 1, township 23 south, range 4 west of the sixth principal meridian, for a consideration of $160 rental per year, leaving the same with the Farmers State Bank of Halstead to be delivered to plaintiff upon his paying $160. Nothing further was ever done with this lease and it remained in the bank until the trial of this case.

"In March of 1929 the defendant, Study, and one D. H. Lehman, after some discussion with Haury over whether it was to be in one piece or in eighty-acre divisions, finally agreed to purchase the lease on the half section in quarter-section tracts for a ten-year term at $1 per acre. The lease was executed by Daniel Haury and left at the bank to be executed by the other owners. Further negotiations were necessary before Carl Haury, guardian of certain minor owners, consented, but the lease was finally signed in December, 1929, and the consideration agreed upon and paid. While the lease was taken in the name of E. L. Study as lessee, it was owned jointly by Study and D. H. Lehman, Lehman furnishing the capital, apparently. Later the south half was sold to an oil company by Study and Lehman. This oil company made an arrangement with Study to drill upon this south half, which was done. Later

Study acquired Lehman's interest in the remaining quarter section by purchase, which was drilled, oil and gas being found on both quarters.

"Sometime in June, 1929, the plaintiff moved to the state of Colorado, turning over his desk in the office to another, and no correspondence was had between plaintiff and defendant relative to any of the oil leases from then on. Plaintiff engaged in the oil business in Colorado on his own account and apparently lost interest in the Halstead field. Plaintiff never claimed an interest in the Haury lease until after it became valuable."

"CONCLUSIONS OF LAW

"1. No partnership was entered into between plaintiff and defendant, the business transactions between the parties being limited to joint ownership of certain oil and gas leases.

"2. The Haury lease involved herein was not jointly owned by the plaintiff and defendant at any time.

"3. Plaintiff is further barred by laches from obtaining the relief sought herein."

Judgment was rendered accordingly. Plaintiff's motion for a new trial was denied, and he appeals, the questions presented depending largely on his contention the undisputed evidence showed a partnership existed.

Space forbids that a complete statement of the evidence, which as abstracted consists of 85 pages of abstract and 50 pages of counter abstract, be made to demonstrate in detail the merit or lack of merit of appellant's contention. We shall limit the matter. The testimony showed that each party had been engaged in procuring leases for oil companies and others whom they represented, and on occasions taking for himself individually leases which the employer did not want. These leases were sold individually. The parties knew each other, and in June, 1928, they determined to operate together for limited purposes. Neither had much capital. They rented an office and equipped the same with secondhand furniture, the cost of which was divided. A sign was put on the window:

"E. L. STUDY<br>
E. L. LAYCOCK<br>
OIL AND GAS LEASES AND ROYALTIES"

They had a telephone installed and the listing in the telephone directory was "Study & Laycock————60." After the office was opened each continued to represent his former employers, but when available leases were discovered by either he took the matter up with the other. Sometimes they purchased the leases and sometimes not. Those purchased were at least largely sold, and as sold there was a

settlement on account of the lease. The gist of the suit pertains to the Haury lease. Daniel Haury owned a one-half interest in certain lands, the other one-half interest belonging to his children and grandchildren. In August, 1928, Daniel Haury came into Laycock's office and wanted him to buy the lease. As a result, a lease was prepared and executed by Mr. Haury to E. M. Laycock, wife of plaintiff, covering lessor's undivided one-half interest in the described real estate, the consideration being $160. This lease was deposited in escrow in a bank at Halstead, to be delivered upon payment of the consideration. That was never done. Study does not seem to have been advised of the above lease. To digress, it appears that affairs went along smoothly between Laycock and Study until in November, 1928. About that time Laycock told Study he had bought a piece of royalty of Alfred Seiler, one-fourth of which was for Study. Study said he didn't want it, as it was "off of the structure"; that he (Study) had bought three pieces of royalty that were close in; they had a disagreement and Laycock said, "After this we will each go his way," and wanted to know whether he would give or take for his part of the office. Laycock asked permission to leave his desk, and while he was around the office from time to time for the next three months, they had no conversations together and made no more deals together. It is not necessary to review the evidence respecting Study's claim that Laycock wrongfully appropriated money to pay for the Seiler royalty. Laycock thereafter operated with one Nelligan and they took leases in northern Kansas in March, 1929. We are not concerned with Laycock's contention that he took them for himself and Study; it must suffice to say he took them in his own name and never mentioned them to Study. In June, 1929, Laycock went to Colorado, where he remained until about the time this action was filed in September, 1932, not communicating with Study in the meantime. To return to the Haury matter, the evidence showed that in March, 1929, Mr. Haury approached Study concerning the lease. Study took time to consider, found a backer, and made arrangements for a lease on the whole interest of Haury, his children and grandchildren. Owing to necessary probate court proceedings this lease was not fully effective until December, 1929. Thereafter Study sold a part of the lease and under arrangements with others developed the whole property. It proved to be quite profitable and thereafter this action followed.

There was other testimony to support the court's findings, as there

was testimony from which a contrary conclusion could have been reached, but we are now concerned only with whether the testimony warranted the findings of fact the court made, and we conclude that it did. Much space in the briefs is devoted to the law of partnership. We do not find it necessary to discuss this phase of the matter. Even had there been a partnership it was ended by mutual consent of the parties long before the Haury lease was taken by Study. Neither need we discuss the force and effect of the lease on the undivided half-interest which Laycock had prepared and placed in escrow in the bank. Study denied any knowledge of it, and it is conceded by Laycock he never made any attempt to complete the purchase.

Essentially this was a fact case, and the trial court's findings are conclusive here.

We notice two other claims of error: One that the court erroneously admitted certain testimony; the other that it erroneously refused to admit offered testimony. As to the first, we observe the trial was to the court, no motion to strike out the claimed erroneously admitted testimony was made, nor is there any showing it was prejudicial. It had to do with a showing that Mr. Haury was a forgetful old man, and was offered to show that certain statements in his deposition might be attributable thereto. If it was error to admit it, the error was technical and not substantial. As to the excluded evidence, it is sufficient to say it was not offered on motion for new trial as required by the civil code, and if there was any error it cannot now be urged.

And finally, it is urged that some of the transactions between the parties have not been finally settled, and however we might conclude on the Haury lease matter, still plaintiff is entitled to an accounting. The court found there was no partnership—therefore, there is no accounting to be had. If Laycock and Study still jointly own certain leases, difficulties concerning each lease would constitute separate causes of action. Stripped of all the explanatory matter and dispute about the relation of the parties, essentially this was a suit to determine whether Laycock had an interest in the Haury lease. It has been demonstrated he did not.

The judgment of the trial court is affirmed.